

October 10, 2017

**SENT VIA FIRST CLASS MAIL & E-MAIL**

U.S. Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W., Stop 5009
Washington, D.C. 20535-5009
ICE-FOIA@dhs.gov

Portland Sub-Office – Office of Chief Counsel (Seattle)
1220 SW 3rd Avenue Suite 300
Portland, OR 97204

Re:   **Freedom of Information Act Request (Expedited Process & Fee Waiver/Limitation Requested)**

To Whom It May Concern:

By this letter, which constitutes a request pursuant to FOIA, 5 U.S.C. § 552 *et seq.*, and the relevant implementing regulations, *see* 6 C.F.R. § 5 *et seq.*, the American Civil Liberties Union of Oregon ("ACLU") submits this Freedom of Information Act ("FOIA") request ("Request") for records about Immigration and Customs Enforcement ("ICE") arrests in and around the Washington County Circuit Court, located at 145 NE 2nd Ave, Hillsboro, OR 97124; the surveillance of those exercising their First Amendment rights as both legal observers filming federal immigration agents or as participants in rallies, protests and vigils; and, more generally, information regarding tall ICE enforcement actions in the vicinity of courthouses in Oregon.

### I. Background

During the Trump presidential campaign, the now-President's rhetoric set the stage for race-based attacks on immigrants and refugees in the United States. This rhetoric was particularly toxic toward people from Muslim majority countries and Latinos. For example, as a candidate, Mr. Trump attempted to use the Spanish language to criminalize implicitly Latino people in the United States when he stated in the final presidential debate, "[W]e have some bad hombres here and we're going to get them

out."[1] Candidate Trump's attack on Latinos was not limited to his comments about his immigration policy stance, as evidenced by his assertion that a federal court judge with Mexican heritage had a conflict in hearing fraud lawsuits made against Donald Trump's university.[2] Such comments from the Trump campaign clearly signaled to the public that if Donald Trump entered office, the Latino population would be a target. Immigration officials in Oregon are now delivering on the Trump campaign's promise, engaging in a clear pattern of racial profiling of Latinos.

Soon after President Trump took office, attorneys began to report to the ACLU that ICE agents were stopping their Latino clients both in and around Oregon courthouses, with many reports coming from Multnomah, Clackamas, and Washington County courthouses. On January 30, 2017, ICE confirmed to the media that agents were making arrests at courthouses in Oregon.[3] Eyewitnesses' accounts related that ICE agents were undercover, in plainclothes, and were stopping and questioning individuals based on their race alone.[4] On April 6, 2017, Oregon Supreme Court Chief Justice Thomas Balmer wrote a letter to Attorney General Jeff Sessions and Secretary of Homeland Security John Kelly explaining that ICE enforcement at Oregon's courthouses was deterring court-mandated appearances and formally requesting that the definition of sensitive locations be expanded to include courthouses.[5]

Oregon is not alone in its concern about ICE enforcement at courthouses. State judges and law enforcement in California,[6] New York,[7] Connecticut,[8] Colorado[9] and

---

[1] Carolina Moreno, *Here's Why Trump's 'Bad Hombres' Comment Was So Offensive*, HUFFINGTON POST, October 20, 2016, http://www.huffingtonpost.com/entry/heres-why-trumps-bad-hombres-comment-was-so-offensive_us_5808e121e4b0180a36e9b995.

[2] *Id.*

[3] Conrad Wilson & Phoebe Flanigan, *ICE Confirms Portland Officials' Fears About Immigration Arrests At Courthouse*, OPB, Feb. 1, 2017, http://www.opb.org/news/article/portland-ice-immigration-arrests-multnomah-county-courthouse/

[4] *Id.*

[5] Ryan Haas & Conrad Wilson, *Oregon Supreme Court Chief Justice Tells ICE To Stay Out Of Courthouses*, OPB, April 7, 2017, http://www.opb.org/news/article/oregon-supreme-court-justice-ice-courthouse-letter/.

[6] Patrick McGreevy, *Blasting federal action on immigration, California's chief justice warns the rule f law is under threat*, L.A. TIMES, March 27, 2017, *available at* http://www.latimes.com/politics/essential/la-pol-ca-essential-politics-updates-california-s-chief-justice-warns-rule-1490657780-htmlstory.html.

[7] http://www.politico.com/states/new-york/city-hall/story/2017/08/03/law-enforcement-court-officials-differ-on-impact-of-ice-courthouse-arrests-113781.

[8] Roque Planas, *Chief Justice In Connecticut Asks ICE To Stay Out Of Courthouses*, Huffington Post, *available at* http://www.huffingtonpost.com/entry/judge-courthouse-immigration-arrests_us_59398006e4b0c5a35c9d3928.

Washington[10] have also formally requested that ICE not make arrests in their courthouses, explaining that the courts should be open and safe locations for all people regardless of citizenship status, and that ICE's actions were interfering with constitutionally protected rights of due process and access to justice. Despite this request from Oregon's highest court, ICE continues to take actions at courthouses. Sessions, Kelly, and ICE spokespeople consistently blame local so-called "sanctuary policies" for the need to take enforcement action in courts.[11]

Through its legal observers, media coverage and individual complaints to the ACLU, the ACLU and the public have become increasingly aware of and concerned about the detrimental effects of ICE enforcement actions in and around Oregon courthouses, particularly in Multnomah, Washington, and Clackamas County, Oregon. ICE actions at Oregon courthouses threaten the safety and security of our country.

The ACLU received numerous reports of routine ICE actions or presence in Washington County, prompting the ACLU to send ACLU ICE Legal Observers to document the arrests every week. On September 18, 2017, a group of interfaith leaders held a vigil outside of the Washington County courthouse in Hillsboro, Oregon, where they solemnly declared through prayer, song, and meditation, that ICE's presence in courthouses is hurting their community. ACLU staff and volunteers were present at the vigil. ACLU ICE Legal Observers were also present in and around the courthouse as they had been for months prior. While the vigil was occurring nearby, multiple agents in plain clothes and unmarked vehicles surrounded two citizens, refused to announce their identity or agency affiliation and insisted that those citizens identify themselves. The agents showed a picture of a person to the two people they stopped and asserted that it was a picture of the man they stopped. According to the man detained for interrogation, the only thing he had in common with the man in the photograph was the color of his skin. Additionally, ACLU witnessed the same ICE agents photographing and surveilling those attending the vigil, a "sensitive location" according to ICE policy memoranda.[12]

Oregon, as well as communities throughout the United States, took serious interest in the events on September 18. Local news outlets, a number of whom were

---

[9] Noelle Phillips, *ICE official tells Denver Mayor Michael Hancock that courthouse arrests will continue*, THE DENVER POST, June 8, 2017, *available at* http://www.denverpost.com/2017/06/08/ice-denver-courthouse-arrests-will-continue/.

[10] Joseph O'Sullivan, *Chief justice asks ICE not to track immigrants at state courthouses*, THE SEATTLE TIMES, March 22, 2017, *available at* http://www.seattletimes.com/seattle-news/politics/chief-justice-asks-ice-not-to-track-immigrants-at-state-courthouses/.

[11] *See, e.g.*, Letter from Jefferson B. Sessions III, U.S. Attorney General, and John F. Kelly, Sec. of Homeland Security, to Tani G. Cantil-Sakauye, Chief Justice, Supreme Court of California (March 29, 2017), *available at* https://www.nytimes.com/interactive/2017/03/31/us/sessions-kelly-letter.html.

[12] Memorandum from John Morton, Director, U.S. Immigration & Customs Enforcement to Field Office Directors, Special Agents in Charge and Chief Counsel (October 24, 2011), *available at* https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf.

present at the vigil, began reporting on the issue the same day.[13] Soon thereafter, local and national media outlets were sharing the video that ACLU disseminated of the events.[14] Oregon's congressional representatives were gravely concerned and called upon ICE to investigate its officers and apologize to the man and his wife who were wrongly suspected of violating immigration laws.[15] Representatives from other states followed suit.[16]

---

[13] *Interfaith group protests outside Washington Co. courthouse over recent ICE arrests*, FOX 12, September 18, 2017, http://www.kptv.com/story/36391920/interfaith-group-protests-outside-washington-co-courthouse-over-recent-ice-arrests.

[14] For local Oregon outlets sharing ACLU's video, *see e.g.,* Everton Bailey Jr., *ICE agents mistakenly try to grab Latino county worker near courthouse*, THE OREGONIAN (Sept. 19, 2017), http://www.oregonlive.com/hillsboro/index.ssf/2017/09/ice_mistakenly_tries_to_grab_l.html; Fox 12 Staff, *OR lawmakers call on ICE to investigate questioning of Hispanic man outside courthouse*, KPTV (Sept. 20, 2017), http://www.kptv.com/story/36415316/or-lawmakers-call-on-ice-to-investigate-questioning-of-hispanic-man-outside-courthouse; Katherine Cook, *US citizen says ICE profiled him in confrontation outside courthouse*, KGW (Sept. 21, 2017), http://www.kgw.com/news/local/latino-us-citizen-says-ice-profiled-him-in-confrontation-outside-courthouse/477482121; Ericka Cruz Guevarra, *Oregon Sheriff: Courthouse ICE Incident Builds Fear, Lowers Trust*, OPB (Sept. 22, 2017) http://kval.com/news/local/ice-agents-approach-us-citizen-a-oregon-courthouse-mistake-him-for-another-hispanic-man; http://www.opb.org/news/article/washington-county-oregon-ice-courthouse-fear-trust/; Doug Brown, *Good Morning News,* THE PORTLAND MERCURY (Sept. 21, 2017) http://www.portlandmercury.com/blogtown/2017/09/21/19334385/good-morning-news-grand-juries-the-arts-tax-and-landslides-in-the-gorge; For national outlets sharing ACLU's video, *see e.g.,* Suzanne Gamboa, *U.S. Citizen Questioned by ICE Blames 'Hatred to Latinos,'* NBC NEWS (Sept. 21, 2017), https://www.nbcnews.com/news/latino/u-s-citizen-questioned-ice-blames-hatred-latinos-n803511; Elizabeth Elizalde, *U.S. citizen says ICE agents stopped him because he's Latino*, NEW YORK DAILY NEWS (Sept. 21, 2017) http://www.nydailynews.com/news/national/u-s-citizen-ice-agents-stopped-latino-article-1.3511952; Breanna Edwards, *Plainclothes ICE Agents Who Did Not Identify Themselves Caught on Video Harassing Latino Citizen*, THE ROOT (Sept. 21, 2017), http://www.theroot.com/plainclothes-ice-agents-who-did-not-identify-themselves-1818622478; Vanessa Crider, *ICE Agents Caught On Video Racially Profile Man After Following Him From Court*, BIPARTISAN REPORT (Sept. 21, 2017), https://bipartisanreport.com/2017/09/21/ice-agents-caught-on-video-racially-profile-man-after-following-him-from-court/; María Peña, *ICE detuvo e interrogó a mexicano con ciudadanía estadounidense, demócratas exigen respuestas*, LA OPINIÓN (Sept. 22, 2017), https://laopinion.com/2017/09/22/ice-detuvo-e-interrogo-a-mexicano-con-ciudadania-estadounidense-democratas-exigen-respuestas/; *Agentes de ICE sin uniforme interrogan a un hispano con ciudadanía en plena calle*, UNIVISION, http://www.univision.com/noticias/agentes-de-ice-sin-uniforme-interrogan-a-un-hispano-con-ciudadania-en-plena-calle-video. The preceding citations do not take into account outlets with strong social media following and dissemination. *See e.g.,* NOW THIS NEWS, https://www.facebook.com/NowThisNews/videos/1714759568555526/ (receiving 5.4 million views on its Facebook post of ACLU's video).

[15] Everton Bailey Jr., *Oregon lawmakers demand investigation, apology over mistaken ICE stop*, THE OREGONIAN, September 20, 2017, *available at* http://www.oregonlive.com/hillsboro/index.ssf/2017/09/oregon_lawmakers_demand_invest.html.

[16] *More lawmakers call for ICE investigation of incident outside Oregon courthouse*, FOX 12, September 22, 2017, *available at* http://www.kptv.com/story/36432138/more-lawmakers-call-for-ice-investigation-of-incident-outside-oregon-courthouse.

We have strong reason to believe that ICE agents working in Oregon are violating internal policies as well as the constitutional rights of Oregonians. Such aggressive racial profiling threatens the safety and security of our country. So, too, does targeting individuals at courthouses. Through this request, the ACLU seeks to facilitate the public's indispensable role in checking the power of our public officials and to learn the facts about exactly how their public officials are conducting themselves in order to assess whether such conduct is consistent with the values and laws enshrined in our Constitution.

## II. Requested Records

For the purposes of this Request, "records" are collectively defined to include, but are not limited to: text communications between phones or other electronic devices (including, but not limited to, communications sent via SMS or other text, Blackberry Messenger, iMessage, WhatsApp, Signal, Gchat, or Twitter direct message); e-mails; images, video and audio recorded on cell phones; voicemail messages; social-media posts; instructions; directives; guidance documents; formal and informal presentations; training documents; bulletins; alerts; updates; advisories; reports; legal and policy memoranda; contracts or agreements; minutes or notes of meetings and phone calls; and memoranda of understanding. The ACLU seeks release of the following:

1) Records created or received in the Seattle Field Office or any ICE offices or sub-offices in Oregon on or after January 20, 2017, regarding immigration enforcement actions in or near Oregon courthouses.

2) Records concerning the number of individuals who have been detained, arrested or otherwise subject to questioning by ICE agents or any officials working in cooperation with ICE in or near an Oregon courthouse dating back to January 1, 2017.

3) Records concerning policies, guidelines, and standards of conduct for officers conducting enforcement actions at or near courthouses, including but not limited to policies about selection of enforcement targets, clothing worn by agents during arrests, in particular, uniforms, display of name and/or badges, providing identification, production of warrants, presence of warrants, use of vehicles and responding to questions raised by those being detained, questioned, arrested and/or witnesses thereto.

4) Records concerning policies, guidelines, and standards of conduct related to discrimination, race-based or otherwise, for officers conducting enforcement actions.

5) All records regarding compliance with 8 U.S.C. § 1229(e), including internal policies.

6) Communications—from January 1, 2017, through the date of fulfilling this request—between any public employee(s) working in an Oregon county's district attorney's office and any ICE employee(s) working in (physically or virtually) Oregon.

7) Communications—from January 1, 2017, through the date of fulfilling this request—between any public employee(s) working in Oregon's judicial branch and any ICE employees(s) working in (physically or virtually) Oregon.

8) Communications—from January 1, 2017, through the date of fulfilling this request—between any public employees working for an Oregon law enforcement agency and any ICE employee(s) working in Oregon.

9) All records concerning activities and enforcement action(s) of ICE agents or officials working in Hillsboro, Oregon on September 18, 2017.

10) All records created by ICE agents or officials that were deployed to, worked in, present in Hillsboro, Oregon on September 18, 2017, including, but not limited to, photographs, videos, reports, notes, documents, etc., including but not limited to, records relating to both the questioning of the two United States citizens stopped by ICE agents as well as the video surveillance of ACLU ICE Legal Observers and the vigil.

11) All communications with or records sent from any ICE official to any other federal government agency or official with information from, about or related to events or persons at the Washington County courthouse(s) and/or in Hillsboro, Oregon on September 18, 2017.

**To reiterate: the ACLU seeks records concerning ICE enforcement actions in and near Oregon's courthouses, in addition to specific records related to events near the Washington County courthouse in Hillsboro, OR on September 18, 2017.** ICE has an obligation to search all field offices and sub-offices that are reasonably expected to produce any relevant information. *See, e.g., Oglesby v. U.S. Dep't of Army,* 920 f.2d 57, 68 (D.C. Cir. 1990); *Marks v. U.S. Dep't of Justice,* 578 F.2d 261, 263 (9th Cir. 1978) (agency not required to search all of its field offices because request did not ask for a search beyond the agency's central files); *see also Am. Immigration Council v. U.S. Dep't of Homeland Sec.,* 950 F. Supp. 2d 221, 230 (D.D.C. 2013).

We request that searches of all electronic and paper/manual indices, filing systems and locations for any and all records relating or referring to the subject of our Request be conducted. Given the observations of agents using cellphones and swift media attention calling for reactions to events on September 18, 2017, the Request includes searches of personal email accounts, work phones of all employees and former employees who may have sent or received emails or text messages regarding the subject matter of this Request. It also includes institutional, shared, group, duty, task force and all other join and/or multi-user email accounts and work phones which may have been utilized by each

such employee or former employee. Additionally, for each relevant email account identified, all storage areas must be searched, including the inbox "folder" (and all subfolders therein), sent folder, deleted folder, and all relevant archive files.

If any records responsive or potentially responsive to the Request have been destroyed, our Request includes, but is not limited to, any and all records relating or referring to the destruction of those records. This includes, but is not limited to, any and all records relating or referring to the events leading to the destruction of those records.

As required by the relevant case law, the agency should follow any leads it discovers during the conduct of its searches and should perform additional searches when said leads indicate that records may be located in another system. Failure to follow clear leads is a violation of FOIA.

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), the ACLU requests that responsive electronic records be provided electronically in their native file format, if possible. Alternatively, the ACLU requests that the records be provided electronically in a text-searchable, static image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files.

## III. Application for Expedited Processing

The ACLU requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E).[17] There is a "compelling need" for these records, as defined in the statute because the information requested is "urgent[ly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

### A. *The ACLU is an organization primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The ACLU is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II).[18] Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU's work and are among its primary activities. *See ACLU v. U.S. Dep't of Justice*, 321 F.Supp.2d 24, 29 n.5 (D.D.C. 2004)(finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").

---

[17] *See also* 6 C.F.R. § 5.5(e)(1).
[18] *See also* 6 C.F.R. § 5.5(e)(1)(ii).

With respect to the subject of this Request, the ACLU has already been primarily engaged in this activity. We wish to gather and disseminate additional information not already in our or the public's possession. Our national organization regularly publishes a print magazine called STAND that is disseminated to over 600,000 people. The ACLU in Oregon publishes a print newsletter that is distributed to about 42,000 people. ACLU of Oregon also publishes regular alerts, comments and updates via social media. ACLU of Oregon has over 9,000 Twitter followers and over 19,000 Facebook followers. Similarly, dissemination happens using e-mail alerts to approximately 70,000 people.

The ACLU also regularly issues press releases to call attention to documents obtained through FOIA and public records requests, as well as other breaking news. ACLU attorneys and staff are interviewed frequently for news stories about documents released through ACLU public records requests, and stories directly related to this Request.

Similarly, the ACLU publishes reports about government conduct and civil liberties issues based on its analysis of information derived from various sources, including information obtained from the government through FOIA and public records requests. This material is broadly circulated to the public and widely available to everyone for no cost. ACLU national projects regularly publish and disseminate reports that include a description and analysis of government documents obtained through FOIA requests. The ACLU also regularly publishes books, "know your rights" materials, fact sheets, and educational brochures and pamphlets designed to educate the public about civil liberties issues and government policies that implicate civil rights and liberties.

The ACLU publishes a widely-read blog where original editorial content reporting on analyzing civil rights and civil liberties news is posted frequently. *See* https://www.aclu-or.org/blog. That blog includes content about specific events that are the subject of this request.[19] Similarly, the ACLU publishes, analyzes and disseminates information about civil rights and civil liberties issues through other pages on its heavily visited website. *See* https://www.aclu-or.org. Through its numerous website pages, the ACLU provides the public with educational material, recent news, analyses of relevant legislative and executive actions, government documents obtained through records requests, and other multi-media features.

The ACLU plans to analyze, publish, and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use and the requesters plan to disseminate the information disclosed as a result of this Request to the public at no cost.

---

[19] Mat dos Santos, *Why are federal immigration agents stopping people outside the county court in Hillsboro?* ACLU of OREGON, September 25, 2017, https://aclu-or.org/en/news/why-are-federal-agents-stopping-people-outside-county-court-hillsboro.

   B. *The records sought are urgently needed to inform the public about actual or alleged government activity.*

These records are needed urgently to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).[20] Specifically, as discussed in Part I, *supra*, the requested records seek to inform the public about ICE's current, local immigration enforcement activity that Oregon leaders have called an end and that threats the civil rights of Oregonians. As Chief Justice Balmer noted, the ICE activities about which the ACLU requests records are deterring Oregonians from attending court. In order to counteract this detrimental effect, the public has an urgent need for transparency in ICE arrests and enforcement actions in Oregon courts.

Given the foregoing, the ACLU has satisfied the requirements for expedited processing of this Request.

## IV. Application for Waiver or Limitation of Fees

The ACLU requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).[21] The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

   A. *The Request is likely to contribute to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the ACLU.*

As discussed above, news accounts underscore the substantial public interest in the records sought through this Request. Given the ongoing and widespread media attention to this issue, the records sought will significantly contribute to public understanding of an issue of profound public importance. Especially because of the secretive nature of the enforcement actions the ACLU seeks information about, the public knows very little about how ICE operations and activities. Therefore, the records sought are certain to contribute significantly to the public's understanding of these issues.

The ACLU is not filing this Request to further its commercial interest. As described above, any information disclosed by the ACLU as a result of this FOIA Request will be available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending the FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003)("Congress amended FOIA to ensure that it be

---

[20] *See also* 6 C.F.R. § 5.5(e)(1)(ii).

[21] *See also* 6 C.F.R. § 5.11(k).

liberally construed in favor of waivers for noncommercial requesters." (quotation marks omitted)).

### B. The ACLU is a representative of the news media and the records are not sought for commercial use.

The ACLU also requests a waiver of search fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii)(III);[22] *see also Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *Serv. Women's Action Network v. U.S. Dep't of Defense*, 888 F. Supp. 2d 282 (D. Conn. 2012) (requesters, including ACLU, were representatives of the news media and thus qualified for fee waivers for FOIA requests to the Department of Defense and Department of Veterans Affairs); *ACLU of Wash. v. U.S. Dep't of Justice*, No. C09–0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011) (finding that the ACLU of Washington is an entity that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"); *ACLU*, 321 F. Supp. 2d at 30 n.5 (finding nonprofit public interest group to be "primarily engaged in disseminating information"). The ACLU is therefore a "representative of the news media" for the same reasons it is "primarily engaged in the dissemination of information."

Furthermore, courts have found other organizations whose mission, function, publishing, and public education activities are similar in kind to the ACLU's to be "representatives of the news media" as well. See, e.g., Cause of Action v. IRS, 125 F. Supp. 3d 145 (D.C. Cir. 2015); *Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 10–15 (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for purposes of the FOIA); *Nat'l Sec. Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[23]

---

[22] *See also* 6 C.F.R. § 5.11(b)(6).

[23] Courts have found these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information / public education activities. *See, e.g., Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d 5; *Nat'l Sec. Archive*, 880 F.2d at 1387; *see also Leadership Conference on Civil Rights*, 404 F. Supp. 2d at 260; *Judicial Watch, Inc.*, 133 F. Supp. 2d at 53-54.

On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU as a "representative of the news media."[24] As was true in those instances, the ACLU meets the requirements for a fee waiver here.

\* \* \*

Pursuant to applicable statutes and regulations, the ACLU expects a determination regarding expedited processing within 10 days. *See* 5 U.S.C. § 552(a)(6)(E)(ii); 6 C.F.R. § 5.5(e)(4).

If the Request is denied in whole or in part, the ACLU asks that you justify all deletions by reference to specific FOIA exemptions. The ACLU expects the release of all segregable portions of otherwise exempt material. The ACLU reserves the right to appeal a decision to withhold any information or deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish the applicable records to:

**ACLU Foundation of Oregon**
**c/o Kelly Simon**
**P.O. Box 40585**
**Portland, OR 97240**
ksimon@aclu-or.org

---

[24] In May 2016, the FBI granted a fee-waiver request regarding a FOIA request issued to the DOJ for documents related to Countering Violent Extremism Programs. In July 2013, the Department of Defense granted the ACLU of Colorado a fee-waiver with respect to contracts between the Department and a local newspaper. In April 2013, the National Security Division of the DOJ granted a fee-waiver request with respect to a request for documents relating to the FISA Amendments Act. Also in April 2013, the DOJ granted a fee-waiver request regarding a FOIA request for documents related to "national security letters" issued under the Electronic Communications Privacy Act. In August 2013, the FBI granted a fee-waiver request related to the same FOIA request issued to the DOJ. In June 2011, the DOJ National Security Division granted a fee waiver to the ACLU with respect to a request for documents relating to the interpretation and implementation of a section of the PATRIOT Act. In March 2009, the State Department granted a fee waiver to the ACLU with regard to a FOIA request for documents relating to the detention, interrogation, treatment, or prosecution of suspected terrorists. Likewise, in December 2008, the Department of Justice granted the ACLU a fee waiver with respect to the same request. In November 2006, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request. In May 2005, the U.S. Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio-frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU for a request regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. In addition, the Department of Defense did not charge the ACLU fees associated with FOIA requests submitted by the ACLU in April 2007, June 2006, February 2006, and October 2003. The DOJ did not charge the ACLU fees associated with FOIA requests submitted by the ACLU in November 2007, December 2005, and December 2004. Finally, three separate agencies—the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the DOJ Office of Information and Privacy—did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

*[signature]*

Mat dos Santos
Legal Director, ACLU of Oregon